1               IN THE CIRCUIT COURT
            FOR LOUDOUN COUNTY, VIRGINIA

2  - - - - - - - - - - - - - - - - -

3
  LANI HAY,                 :

4
         Plaintiff,       :

5
   Vs.               : Case No.

6
  TAYLOR FRANCOIS-BODINE d/b/a : 107-CL-19-00061300

7
  FRANCOIS-BODINE CONSULTING  :

8
        Defendant,       :

9  - - - - - - - - - - - - - - - - -

10

11               ZOOM CONFERENCING

12
     Deposition Of TAYLOR FRANCOIS-BODINE

13
         Friday, June 12, 2020

14

15
  ELSS EXECUTIVE REPORTING, LLC

16  CERTIFIED COURT REPORTERS AND VIDEOGRAPHERS
  (888) 641-1147

17  www.elssreporting.com

18  Reported by:  Donna Lynch, Court Reporter

19  Job No.  06122020-1

20

21

22

```
 1    from the computer, I am going to reserve my right

 2    to proceed again and file a Motion if we can't

 3    get answers to all my questions regarding the

 4    documents that we have today.

 5            Do you have -- I believe you said you

 6    don't have any other documents that are

 7    responsive to the request.  You are standing on

 8    what your attorneys or your former attorneys have

 9    produced in the case, is that correct?

10        A.   Yes.

11        Q.   And you are an attorney yourself, is

12    that correct?

13        A.   No.

14        Q.   You have a jurist doctorate degree, is

15    that correct?

16        A.   Yes.

17        Q.   When did you receive that jurist

18    doctorate degree?

19        A.   In December of 2018.

20        Q.   And are you admitted to practice law in

21    any jurisdiction?

22        A.   No.
```

1      Q.   Have you ever been admitted to practice

2  law in any jurisdiction?

3      A.   No.

4      Q.   Have you every applied to practice law

5  in any jurisdiction?

6      A.   No.

7      Q.   And you are presently not represented by

8  counsel; is that correct?

9      A.   That is correct.

10     Q.   Can you please state your present

11  address for the record?

12     A.   42779 Travelers Run Lane, Leesburg,

13  Virginia 20176.

14     Q.   And is that also your business address?

15     A.   That is where I receive mail for the

16  business.

17     Q.   Okay.  And what business are you

18  referring to there?

19     A.   The business of Francois-Bodine

20  Consulting.

21     Q.   Do you receive any other business mail

22  for any other businesses you own or operate at

1   that address?

2        A.   No.

3        Q.   And have you ever had your deposition

4   taken before?

5        A.   No.

6        Q.   The rules are pretty straightforward and

7   you're doing just fine so far.  Any question that

8   I ask that you don't understand I'm going to ask

9   that if you don't understand the question ask me

10  to rephrase and I will do so.

11            If you answer a question I'm going to

12  assume and hold you to that answer that you've

13  understood the question and you're answering

14  truthfully and fully to the best of your ability;

15  is that fair?

16       A.   Yes.

17       Q.   You seem to have cut out your video, is

18  there a problem?

19       A.   No, it says that the host has cut out

20  the video.

21       Q.   Okay.

22            MR. SCHROEDER: Madame Court

```
 1        Q.   Were you ever crowned Miss Maryland in a
 2   beauty pageant?
 3        A.   Yes.
 4        Q.   How did you satisfy the residency
 5   requirements for that pageant for Maryland?
 6        A.   Because the requirements were that if
 7   you lived within fifteen miles of a Maryland city
 8   that you would satisfy the requirements.
 9             My apologies I stand corrected, it was
10   if you lived within twenty miles of a Maryland
11   city that you would satisfy their requirements.
12        Q.   And is that in writing anywhere?
13        A.   On their website.
14        Q.   Can you briefly explain to me your
15   educational history; where did you go to school
16   and what degrees do you have and when did you get
17   them?
18        A.   So, I went to high school in
19   Ponchatoula, Louisiana.  Graduated in 2010.  I
20   went to school at Louisiana Tech and then I got
21   my jurist doctorate in December 2018.
22        Q.   What did you study at Louisiana Tech?
```

```
 1        A.   Political Science and Business.

 2        Q.   Did you get a degree?

 3        A.   I did.

 4        Q.   What degree did you get?

 5        A.   A Political Science degree.

 6        Q.   Okay.  And what year did you get that

 7  in?

 8        A.   I don't specifically remember as I

 9  graduated a year early.  It was in December of

10  the second year, so I could be off, but I would

11  assume 2013/14.

12        Q.   That's one of the other rules of the

13  deposition today, if you're not sure it's

14  perfectly fine to tell me that you're not sure.

15             I don't want you to guess because I am

16  going to hold you to your answers.  So you did

17  just fine explaining that, but I want to make

18  sure that if you do give me an answer I'm going

19  to hold you to that answer, is that fair?

20        A.   Yes.

21        Q.   Okay.

22             Where did you obtain your jurist
```

```
 1   doctorate degree from?

 2        A.   Washington College of Law.

 3        Q.   And did you receive any honors or were

 4   you in any clinic programs?

 5        A.   I did not.

 6        Q.   And can you briefly explain your

 7   employment history beginning in 2010?

 8        A.   In 2010 I started working for Senator

 9   Kerry at first and then I don't have the years,

10   I'm unsure, but I worked for a congressional

11   campaign in Michigan for Congressman Gary Peters.

12             I then started an automotive business in

13   conjunction with starting Francois-Bodine

14   Consulting, FB Consulting.

15        Q.   Let's talk about that for a second.

16   Francois-Bodine Consulting and FB Consulting, are

17   they the same entities, are they different

18   entities or what's the difference?

19        A.   FB -- they're the same entities, but

20   it's FB Consulting, Inc. and FB Consulting,

21   Francois-Bodine Consulting are the same entities.

22        Q.   And what does FB Consulting do?
```

```
 1        A.   I help clients having trouble finding

 2   partners, help themselves, and while doing so

 3   match them with prospective partners.

 4        Q.   And when did you start FB Consulting?

 5        A.   I don't have the specific date.

 6        Q.   Well, how long has it been in existence,

 7   one year, two years, three years?

 8        A.   More than two years.  I don't have the

 9   specific date.

10        Q.   Okay.  What was the name of the auto

11   business?

12        A.   It was R&T Ventures.

13        Q.   And what did you do for that, R&T

14   Ventures?

15        A.   I did everything for the company in

16   terms of sales, operations with clients,

17   marketing, day-to-day business tasks.

18        Q.   Would Senator Kerry recognize you or

19   your name?

20        A.   I don't have an answer for that.

21        Q.   Are you on a first name basis with

22   Senator Kerry?
```

 1   manner, fashion, so I wouldn't be sure as to

 2   when.

 3       Q.   What specifically did you say to her

 4   regarding Senator Kerry?

 5       A.   I think she asked or it came up about

 6   how I got to the D.C. area and naturally what I

 7   first did when I got here and how that translated

 8   into me deciding that I wanted to start my own

 9   business.

10       Q.   You don't recall specifically what you

11   said because that's just very general.

12       A.   It was a very general conversation, so

13   that's all that I can recollect.

14       Q.   Okay.

15            You don't recall making any specific

16   statements regarding your relationship with

17   Senator Kerry; is that true?

18       A.   Other than what I just provided in terms

19   of that being my first employment upon getting to

20   D.C.

21       Q.   What's your title with Francois-Bodine

22   Consulting?

 1      A.   Owner/founder.

 2      Q.   Has Francois-Bodine Consulting ever had

 3  any employees?

 4      A.   No direct employees.

 5      Q.   What does that mean when you say, no

 6  direct employees?

 7      A.   Well, I should just -- I'll rephrase,

 8  the answer is no.

 9      Q.   So, you've not had any employees, is

10  that correct?

11      A.   Correct, only outsourcing of work.

12      Q.   Did you ever have a scheduling

13  assistant?

14      A.   I did.

15      Q.   Who was that?

16      A.   So the scheduling assistant would be one

17  of the recruiters that I may have been using at

18  the time who would have helped schedule things.

19      Q.   And so you had more than one scheduling

20  assistant or just one?

21      A.   So, their job wouldn't just be

22  scheduling, but there are always numerous people

1   who are helping in recruiting efforts.

2       Q.   And who were they?

3       A.   It completely depends on the time period

4   as recruiter's availability changes and also

5   their access changes.  So I don't have any

6   specifics of who that specifically was.

7       Q.   And you didn't actually pay them for

8   scheduling, did you?

9       A.   So, they were paid for recruiting and

10  scheduling times for meetings with persons.

11      Q.   So, the recruiters you worked for in

12  Ms. Hay's matter, did you pay any of those

13  recruiters for their referrals or scheduling

14  efforts?

15      A.   I don't specifically remember who worked

16  with all of her matching.  But there likely was

17  some compensation or payment for some, but

18  definitely not all of the efforts.

19      Q.   And what records do you have of those

20  payments for those efforts?

21      A.   I would only have the information that

22  was provided to you by former counsel.

1      Q.   Sitting here today you can't point me to

2   a specific document that shows you paid any of

3   the matchmakers or scheduling or for making

4   referrals regarding Ms. Hay, is that correct?

5      A.   Well, generally the recruiters would be

6   paid upon the client, you know, going on said

7   date, meaning agreeing to the match and, you

8   know, being complicit and actually arriving at

9   the date.

10         In Ms. Hay's case she declined so many.

11   It would be hard to remember specifically which

12   would have rendered payment cause there were so

13   many dates that never happened.

14      Q.   Okay.

15         So for the dates that did happen what

16   records do you have of paying the recruiters for

17   the date?

18      A.   Well, what you would have would be the

19   communication between myself and recruiter slash

20   / in some cases for her other matchmakers.  And

21   that would be, you know, the record of that.

22         If there was no mention funds there then

1    that may not have been for the efforts of the

2    paid recruiter.

3            Again, she was given many date options

4    and some she turned down, in fact many, so those

5    payments may not have come to fruition.

6        Q.   But sitting here today can you tell me

7    what happened to the Fifty Thousand Dollars that

8    the Plaintiff gave you?

9        A.   I could not give you any information in

10   regard to that specifically.

11       Q.   Well, you received cash, correct?

12       A.   I received a partial payment.

13       Q.   You received cash, correct?

14       A.   Yes.

15       Q.   What did you do with that cash that you

16   received in October of 2018?

17       A.   Well, first I deposited some of the

18   cash.

19       Q.   Where did you deposit it?

20       A.   Into the bank.

21       Q.   What bank?

22       A.   I don't specifically know which one of

1    the banks.

2         Q.   Do you have a deposit slip?

3         A.   I'm sure I could provide one or an

4    online transaction record.

5         Q.   Well, if you have a deposit slip for

6    that money I believe that's a responsive document

7    that you should look for and since it's in

8    dispute I think it is very relevant.

9              As I understand your testimony, you're

10   telling me that you deposited at least a portion

11   of the cash that Ms. Hay provided to you; is that

12   correct?

13        A.   Some portion and I have no -- to be

14   clear, I have no deposit slip.  There would only

15   be an online potential transaction record, but

16   wouldn't be specific to her unless there's some

17   way to specifically find that.

18        Q.   Well, how much did you deposit?

19        A.   I'm unsure.

20        Q.   What did you do with the remainder?

21        A.   I'm unsure.

22        Q.   Where would you go online to find if you

1   could have any record of the deposit?

2       A.   Where would I go online, where do you

3   mean?

4       Q.   Where, what bank, what site would you go

5   to, to find if you made this deposit or not?

6       A.   I'd have to first know or recall which

7   bank it was deposited in and at this time I'm

8   unsure.  So I can't tell you which website I

9   would go to.

10      Q.   I see, so you had multiple banks in

11  2018, is that right?

12      A.   I'm unsure.

13      Q.   You don't know how many bank accounts

14  you had in 2018?

15      A.   I don't specifically know, no.

16      Q.   And you don't know what account you

17  deposited the cash in; is that correct?

18      A.   No, I don't specifically know,

19  otherwise, I would have provided more

20  information.

21      Q.   And sitting here today can you tell me

22  what you used any of the money that Plaintiff

1   Lani Hay gave you for?

2       A.   I don't have any specific information,

3   it was some time ago.

4       Q.   Did you pay any recruiters for any of

5   the dates that Ms. Hay went on using her money?

6       A.   As I stated before, it would depend on

7   if Ms. Hay went on specific dates or what have

8   you.  I have no further information in that

9   regard.

10      Q.   Do you have any written contracts with

11  these recruiters who also provide scheduling

12  assistance to you?

13      A.   No, it's rather on the basis of the type

14  of prospects they have access to at said time,

15  the number of events, and it can vary.  So

16  there's no specific contract in that regard

17  unless something's rendered.

18      Q.   So, sitting here today you can't tell me

19  if any of the matchmakers and recruiters that you

20  identified in your Answers to Interrogatories

21  actually have a contract with you or Francois-

22  Bodine Consulting; is that correct?

1      A.   So no matchmaker -- no -- it would be

2    unusual for a matchmaker to have a said contract

3    with another matchmaker.

4          It would also be highly unusual to have

5    a specific contract with a recruiter unless a

6    positive match is rendered.  But that would not

7    stop the recruiter from scheduling time for me,

8    the matchmaker, to see, speak or whatever with a

9    potential.

10          And that's all the information I have in

11    that regard.

12      Q.   So, I'm not asking what's typical or

13    usual in your profession.  I'm asking

14    specifically with Ms. Hay whether or not you have

15    any written agreements with any of the

16    matchmakers that you were arranging dates or

17    coordinating prospective candidates for?

18      A.   So, that answer that I just previously

19    gave would transfer also to the situation with

20    Ms. Hay.

21      Q.   What is Maxed, Inc.?

22      A.   So Maxed, Inc. is a wellness business

```
 1    whether or not you told her this company was

 2    owned by your, at least in part, by your husband;

 3    is that correct?

 4        A.   Well, the -- I don't specifically

 5    remember, you'd have to look at the email, but

 6    thank you.

 7        Q.   FB Consulting, Inc. is a corporation; is

 8    that correct?

 9        A.   It is.

10        Q.   Is it still in existence?

11        A.   It is still -- no, it's still in

12    existence but has not been -- it's not been

13    active for about the past year.

14        Q.   Well, what does that mean?  Does it have

15    -- are there still board meetings?

16        A.   It means that there's no matchmaking

17    operations.

18        Q.   When was the last time you made a match

19    through FB Consulting, Inc.?

20        A.   I don't specifically recall, but I know

21    that I have certainly taken a little bit more

22    than a year off.  So that's as close as I can get
```

1    to a specific time.

2         Q.   How many clients did Francois-Bodine

3    Consulting or FB Consulting, Inc. have in 2018?

4         A.   I don't specifically recall.

5         Q.   Do you have any records that would show

6    the customers or clients that the entity had?

7         A.   No.  There's no recordkeeping of that

8    nature other than what has already been provided

9    by my counsel in regard to that.

10        Q.   How many clients did FB Consulting or

11   Francois-Bodine Consulting have in 2017?

12        A.   I don't specifically know.  If I

13   couldn't remember how many were in 2018, going

14   back a year further certainly doesn't help.

15        Q.   In the history of Francois-Bodine

16   Consulting how many clients have you had?

17        A.   I don't have a specific number.

18        Q.   More than ten?

19        A.   Yes.

20        Q.   More than twenty?

21        A.   I don't have the specific number so it's

22   hard to be accurate and fair and truthful if I

```
 1    don't know a specific number.

 2         Q.   Okay.

 3              Have you ever claimed that you,

 4    Francois-Bodine Consulting or FB Consulting,

 5    Inc., had a hundred percent success rate in

 6    placing clients with prospective partners?

 7         A.   A near hundred percent success rate

 8    after two years of continuing work.

 9         Q.   So you still stand by that near a

10    hundred percent?

11         A.   Near a hundred percent if the client

12    remained for two full years.

13         Q.   What did you tell Ms. Hay was your

14    success rate?

15         A.   This was an interaction between myself

16    and Ms. Hay that was in 2018.  The numbers always

17    change depending on the success each year so I

18    wouldn't exactly recall what it was in 2018.

19         Q.   How could I verify those numbers though,

20    because as I understand you don't have any record

21    regarding the client's for Francois-Bodine

22    Consulting or FB Consulting?
```

```
 1        A.   Well, I don't know how you would verify
 2   as the matchmaking service is private and
 3   discreet, which is why people use the matchmaking
 4   service as opposed to using some other services,
 5   so I'm unsure as to how you would verify that.
 6        Q.   Well, without documents how could I
 7   verify that at all by determining whether or not
 8   you had a near hundred percent success rate?
 9        A.   It's unclear to me how you would verify
10   that.  Generally if clients have a question about
11   that they would ask and if they were desiring to
12   verify in the way that you've mentioned they
13   would ask for references, at which time I would
14   provide to them the same response that I gave to
15   you about the confidential nature of the
16   matchmaking business, at which time if the client
17   felt that was satisfactory they would continue on
18   with the engagement.  And if they felt it was
19   unsatisfactory they would decline to work
20   together.
21        Q.   So, your testimony today is you gave no
22   references to Ms. Lani Hay; is that correct?
```

1      A.   That's, in fact Ms. Hay asked for

2   references and I explained the very answer that

3   I've explained to you.

4      Q.   Okay.

5           How many matches has Francois-Bodine

6   Consulting or FB Consulting made?

7      A.   I'm unsure of the specific number.  And

8   what do you mean by match?

9      Q.   Well, that's what I'm trying to

10  understand what success means and I'm trying to

11  understand when you make a partnership -- as I

12  understand it, you're trying to match people to

13  form successful partnerships, so I'm trying to

14  see if any of your clients ever met their match

15  and got married, as I understand that's one of

16  the goals?

17     A.   Well, the matchmaking business as well

18  as FB Consultant and Francois-Bodine Consulting

19  defines success on the basis of a client and the

20  respective partner meeting, finding compatibility

21  and deciding that they no longer need matchmaking

22  services.

1          In 2020 not everyone desires to get

2    married, that's not the goal.

3          The fact that they found a match and can

4    move on to long partnership if they so choose,

5    defines a match.

6        Q.   Okay.  How many long term partnerships

7    have you arranged?

8        A.   I don't have a specific number.

9        Q.   More than ten?

10       A.   I don't have a specific number.

11       Q.   And there's not records that you keep

12   that would help you give me a number; is that

13   correct?

14       A.   I have no other information than what

15   was provided.  If that was not sufficient, I'm

16   sorry.

17       Q.   Other than Ms. Hay did you have any

18   other clients in 2018?

19       A.   You already asked that and I said to my

20   recollection I cannot give you any specific

21   answer, that's almost three years ago now.

22       Q.   Sitting here today you can't tell me if

1    her, but I'm unsure.

2         Q.   Did you or Francois-Bodine Consulting

3    have any clients in 2019?

4         A.   I am unsure.  I'm not able to give you a

5    specific answer there.

6         Q.   Do you maintain any kind of data base

7    regarding prospective candidates or recruiters or

8    information regarding clients?

9         A.   Other than, so the answer's, no.  Other

10   than date details or profiles that I make

11   individually for each client and send out to

12   them, no.

13        Q.   Where do you keep those profiles that

14   you make for a client like Ms. Hay?

15        A.   So, I don't actually keep them.  They

16   would be on an email chain similar to the five

17   hundred some pages of things that you have

18   received from my attorney.

19        Q.   Other than emails, do you maintain any

20   profiles or information regarding potential

21   matches or recruiters or clients?

22        A.   I do not.

1        Q.   So, your business is not like eHarmony,

2    correct?

3        A.   In what respect?

4        Q.   Well, eHarmony, do you know what

5    eHarmony is?

6        A.   I do, but in what respect are we

7    dissimilar or similar?

8        Q.   Yeah, that's what I'm asking you, how

9    are you similar to or dissimilar from eHarmony?

10       A.   Well, I believe eHarmony is user run.

11   That they pick matches on their own.  There's no

12   matchmaker or live third party that advises them

13   on their dates and gives them dating feedback.

14   And I'd also say that eHarmony is certainly not

15   currated to anyone's specific wants and desires,

16   it's more of just a pool.

17       Q.   Okay.

18            What research did you do regarding

19   Ms. Hay and her preferences for a match?

20       A.   Can you further clarify?

21       Q.   Sure.

22            What information did you gather to

1   experiences I would be giving her date feedback

2   which would be real-time.  And if she was to

3   respond quickly and in twenty-four hours we could

4   quickly course correct if need be.

5       Q.  Okay.

6           Did you give her any information or tell

7   her or promise her anything in the second session

8   at the Ritz Carlton?

9       A.  Nothing different than the first.

10      Q.  When did you decide to help her?

11      A.  We had a phone call after the first

12  meeting to meet again and discuss.  And upon the

13  second meeting, her agreeing to my conditions,

14  made me feel like I could accept her as a client.

15      Q.  I see.  Going back a little bit, does FB

16  Consultants, Inc. pay taxes?

17      A.  It does.

18      Q.  Do you have any tax returns for the

19  company?

20      A.  Nothing that I have on hand or easy

21  access to or any access to.

22      Q.  What does that mean?  Does it have an

1    accountant?

2        A.   Yes.

3        Q.   Who is the accountant?

4        A.   Well, the business -- we no longer use

5    an accountant because it's not, it has nothing,

6    no business.

7        Q.   So, you don't know, but is it still

8    filing tax returns even though it doesn't have

9    any income?

10       A.   I would have to look as to this last tax

11   period.  I'm unsure.

12       Q.   Do you know if there's tax returns for

13   2018 that reflects income for the company in

14   2018?

15       A.   I'm unsure.

16       Q.   Who was the accountant you were using in

17   2018?

18       A.   I'm also unsure.

19       Q.   You at least had some income in 2018

20   cause Ms. Hay provided you cash.  So is that

21   reflected in your tax returns to your knowledge?

22       A.   I'm unsure as discussed between what

1  cash went where because everything wasn't, I'm

2  unsure, but likely.

3       Q.  Did you sign tax returns on behalf of

4  the company?

5       A.  I'm unsure.

6       Q.  Sitting here today, you can't tell me

7  whether the company filed taxes in 2018 or 2019

8  for 2018 income; is that correct?

9       A.  I'm unsure as -- I'm unsure

10  specifically.  I don't want to speak out of

11  uncertainty.

12       Q.  Did you report any of the cash that Lani

13  Hay provided to you as personal income on your

14  personal taxes?

15       A.  I'm sorry?

16       Q.  On your personal taxes, you file

17  personal taxes, correct?

18       A.  Yes.

19       Q.  Did you file jointly with your husband?

20       A.  I'm unsure, depending on the year, I'm

21  unsure.

22       Q.  For the tax year 2018 did you file

1    jointly with your husband?

2         A.   I'm unsure, that's two years ago.

3         Q.   Did you use an accountant in 2018?

4         A.   I'm unsure what was used.

5         Q.   Okay.  If you had an accountant, who

6    would you have used?

7         A.   I'm unsure of who I would have used for

8    the business; I'm unsure.

9         Q.   Well, I'm talking not just about the

10   business, I'm talking about you personally, did

11   you prepare your own taxes?

12        A.   No, but...

13        Q.   For 2018?

14        A.   No, my husband sometimes handles these

15   things, so I'm unsure.

16        Q.   Have you looked for tax records for the

17   company and for yourself personally to see if you

18   reported the income that Ms. Hay provided?

19        A.   If these are things that were on the

20   Subpoena then, yes, I have.  But you did ask for

21   a lot of things so I can't speak out of turn.

22        Q.   Okay.

1           Does the company maintain any business

2    records regarding board meetings or resolutions

3    or anything resembling a corporation?

4         A.   We have information, yes.

5         Q.   Does Francois-Bodine Consulting maintain

6    records regarding its business affairs and its

7    corporate formalities like board meetings and

8    resolutions and such?

9         A.   I believe we provided you with the

10   information that I have.  I'm sorry, I have no

11   other information.

12        Q.   You have no other information?

13        A.   I do not.

14        Q.   Is there anybody else who is associated

15   or invested in Francois-Bodine Consulting or FB

16   Consulting, Inc.?

17        A.   No.

18        Q.   Does the company have any assets?

19        A.   I'm unsure.

20        Q.   Okay.  Does the company have any debts

21   or liabilities?

22        A.   I'm unsure.

 1       Q.   Does the company maintain a bank

 2   account?

 3       A.   It did, but not having done business for

 4   some time, I'm not sure about the activity.

 5       Q.   Has Francois-Bodine Consulting ever been

 6   sued?

 7       A.   Yes.

 8       Q.   When was that?

 9       A.   I can't recall the date or year, but

10   certainly it was before Ms. Hay.

11       Q.   Before Ms. Hay, is that correct?

12       A.   Yes, in fact, it was publicly on the

13   Internet prior to Ms. Hay.

14       Q.   Did you disclose that you had been sued

15   or the company had been sued to Ms. Hay at any

16   point and time?

17       A.   In fact I did.  I shared with Ms. Hay

18   that my philosophy on matchmaking had completely

19   changed after the lawsuit.  And that was based on

20   the fact that I felt like clients also had to put

21   in some work in order to have effective matching,

22   and that it wasn't solely on the basis of the

 1   matchmaker, which was why I was so clear with

 2   Ms. Hay about my philosophy, and also what I

 3   would require from her as to take her on.  You

 4   see, at the time she contacted me I was not

 5   looking for clients.  In fact, I didn't really

 6   want to be even doing that so much.

 7        Q.   What was the nature of the allegations

 8   in the lawsuit?

 9        A.   I don't specifically recall as the case

10   never went anywhere.

11        Q.   At some point it settled; is that

12   correct?

13        A.   I don't have any information further

14   that I'm able to provide to you about it.

15        Q.   Well, your Answers to Interrogatories

16   suggest that it was settled.  So you can confirm

17   what you've already put in under oath.

18        A.   Yes.

19        Q.   Did you make a payment?

20        A.   I can't give you any further

21   information.

22        Q.   Why not?

1        A.   Because it's a closed matter.

2        Q.   When was the lawsuit filed?

3        A.   Before I ever met with Ms. Hay.   In

4    fact, it was also settled before I met with

5    Ms. Hay.   In fact, it was all over the Internet

6    when you typed in my name or Francois-Bodine

7    Consulting, all over.

8        Q.   Where was the lawsuit filed, where?

9        A.   New York.

10       Q.   Okay.   Did you give any testimony in

11   that case?

12       A.   I can't give you any information, but

13   there never was a trial.

14       Q.   All right.   I'm entitled to know whether

15   you gave deposition testimony.

16       A.   Oh, well my answer would be no and I

17   answered that earlier.   I've never given any

18   deposition, I'm sorry.

19       Q.   Okay.   Did you sign the Answers to

20   Interrogatories in that case like you did in this

21   case?

22       A.   I don't have any further information, I

1    don't even recall.

2         Q.   Do you have any documents relating to

3    that lawsuit?

4         A.   I'm unsure.  I don't believe I have

5    anything to provide.

6         Q.   Do you have a copy of the Complaint?

7         A.   I do not, but I believe...

8         Q.   Have you ever been arrested?

9         A.   Yes.

10        Q.   When was that?

11        A.   When I was sixteen years old.

12        Q.   For what?

13        A.   A disagreement about a -- I believe it

14   was a disagreement about a laptop that I owned

15   that was in someone else's possession.  And it

16   was, there was some inaccuracies as to who the

17   laptop belonged to, so as soon as I was brought

18   down I was released and they realized it was

19   mine.

20        Q.   This was Louisiana?

21        A.   No.

22        Q.   Okay.  Well, where were you arrested,

1        Q.   You're not asserting that as a defense

2    to your knowledge?

3        A.   I'm unable to answer further about that.

4        Q.   Did you review the Complaint?

5        A.   I did.

6        Q.   Are you making any argument or asserting

7    any defense that this is not a consumer

8    transaction?

9        A.   We have responded to the Complaint so

10   please see those answers.  I have no further

11   elaborative information to give you at this time.

12       Q.   Well, today I'm asking you any facts or

13   for any facts, any information that you have to

14   suggest that the contract between Francois-Bodine

15   Consulting and Lani Hay was something other than

16   a consumer transaction?

17            I'm entitled to get any facts or

18   information regarding any such contention you are

19   making in this case.

20       A.   I have no further information to give

21   you at this time.

22       Q.   Do you have any reason to believe any

1    documents, any facts, any information to believe

2    that this contract between you and Ms. Hay is

3    something other than a consumer transaction?

4        A.   I have no other information to give you

5    at this time.

6        Q.   You don't know.

7            Do you know if this is a consumer

8    transaction or not?

9        A.   I have no information to give you at

10   this time.

11       Q.   Do you believe that this is a business

12   transaction in any way?

13       A.   I have no information other than what

14   I've just given.

15       Q.   You're aware that Count 1 of the

16   Complaint alleges a breach of a written contract

17   between the parties?

18           Are you aware of that?

19       A.   I am.

20       Q.   Do you agree that there is a written

21   contract between the parties?

22       A.   I do.

1       A.   I promised her what I just described,

2    that would encompass...

3       Q.   Did you...

4       A.   ...promises.

5       Q.   Did you tell her you had a unique and

6    special process?

7       A.   Yes.

8       Q.   Did you have a unique and special

9    process?

10      A.   Yes, the unique and special process is

11   me.

12      Q.   Anything else unique or special about

13   your process for introducing her to proper

14   qualified candidates?

15      A.   Well, they're based on my personal

16   ability and the personal ability of any network

17   to match Ms. Hay based on the criteria that she

18   outlined.  And I agreed to upon the initial and

19   second meeting that would make the service quite

20   unique, as you can't duplicate me.

21      Q.   Did you tell her you had a data base?

22      A.   I'm unsure of specifically what she was

1    told in that regard.  We'd have to look to the

2    emails.  But I was very clear that in terms of

3    database or connections that they were all based

4    upon who was single and available at the time and

5    based on personal contacts, outreach, and things

6    of that nature.

7         Q.   Did you tell her you had your own

8    database?

9         A.   My answer still stands.

10        Q.   Did you have your own personal database

11   of qualified candidates?

12        A.   My database of qualified candidates is

13   the basis of my network, my contacts and

14   depending on who was available at the specific

15   time and that's how I do it because it's very

16   selective based on the unique wants of the

17   client.  That's...

18        Q.   Did you tell her -- I'm sorry?

19        A.   That's what I shared with Ms. Hay.

20        Q.   Did you tell her that you were going to

21   be working with other matchmakers to identify

22   potential proper candidates?

1        A.   I do not recall specifically, in fact

2    outlined all of the modes and methods of finding

3    her partner, but I certainly shared that I'd be

4    using a network.

5        Q.   Did you tell her the names of any of

6    these matchmakers that you were going to consult?

7        A.   No, as it would change depending on who

8    would be available that met her criteria.  But

9    upon Ms. Hay expressing her dissatisfaction in

10   the second to final email communication between

11   she and I, she did ask about the use of other

12   matchmakers.

13       Q.   Did she tell you she had prior bad

14   experiences with matchmakers?

15       A.   She shared that she had some

16   difficulties with other matchmaker, I believe two

17   matchmakers potentially, but she did not further

18   elaborate on it other than to say that she felt

19   that they were not relatable and did not like the

20   low quality people they provided to her.

21       Q.   And you assured her that you were

22   different, correct?

1        A.   Ms. Hay did not ask if I was, how I was

2   dissimilar nor similar to the other matchmakers.

3   She asked only, and I provided, that I'd be using

4   a network and so not simply a sitting database

5   but a network of people who constantly change

6   based upon who was available and single at the

7   time and that is what I provided to Ms. Hay.

8        Q.   You told her that it was your network,

9   correct?

10        A.   I told Ms. Hay a network.

11        Q.   Does Francois-Bodine Consulting maintain

12   any proprietary information in any database or

13   search engine or online network?

14        A.   So they do -- Francois-Bodine Consulting

15   does not other than the very unique way in which

16   I get to learn extensively about the clients.

17        In Ms. Hay's situation she shared a very

18   detailed past from her childhood and her failed

19   marriages.  And by understanding the client and

20   learning what it is that they hope to find in a

21   partner, in addition to coupling that with dating

22   feedback, based on the dates that they go on, the

1   spoken to them prior.  If there is a candidate

2   which I did not speak or see in live-time, the

3   person, it would come from a very reputable

4   matchmaker with whom I have done business with in

5   the past who has a very nice caliber of

6   clientele.  I would have seen the picture and all

7   information about the person and together myself

8   and the other matchmaker would determine that it

9   would be a very good fit.  In addition, Ms. Hay

10  has asked, never asked before that I have any

11  contact with all persons after which time Ms. Hay

12  started to voice her displeasure I made an

13  affirmation to her that I would then make sure

14  that I have laid physical eyes on the client

15  and/or spoken with the client before any match

16  would occur, at which time that occurred during

17  every instances thereafter.  To find such a date

18  you would need to look at the emails at which

19  time I made such affirmation to Ms. Hay upon her

20  displeasure.

21       Q.   What salary do you take from Francois-

22  Bodine Consulting?

1      A.   I am unsure as I don't have any records

2    that I could look to for the information.

3      Q.   Did it pay any other salaries to any

4    other person?

5      A.   There are no other persons with whom

6    that would apply.

7      Q.   Did you market yourself as a leading

8    luxury matchmaking and an elite relationship

9    consulting firm in the Washington, DC metro area?

10      A.   I'm unsure as to what do you mean by

11    market, you'd have to be more specific.

12      Q.   Advertise, promote, tell to anybody that

13    you and Francois-Bodine Consulting were a leading

14    luxury matchmaking and elite relationship

15    consulting firm?

16      A.   I'm unsure specifically in terms of

17    marketing.  We did have a Facebook page and a

18    website.  For specific language you'd need to

19    refer to the posts.

20      Q.   Did you or Francois-Bodine Consulting

21    hold yourself out as a leading luxury matchmaking

22    and elite relationship consulting firm in the

1  Washington, DC area?

2       A.   The statement and my response still

3  stands.

4       Q.   You can't tell me whether you held

5  yourself out as that or not, is that true?

6       A.   You're using very specific wording at

7  which I've referred you to two sources that you

8  do have documentation on that you can refer to

9  about that.

10           I've always marketed or not marketed,

11  I've held myself out as a matchmaker with a very

12  unique ability to match people based on their

13  unique stories and background with other people

14  who could be good matches for them and that it

15  it's a bespoke service with a small number of

16  clients and those people are generally in the

17  Washington, DC area, at least when I started

18  business, so that's what I hold out.

19       Q.   And what do you mean by leading

20  consulting firm?

21       A.   So, leading would mean, and again you'd

22  have to look at the information on either the

1    Answer to Interrogatory No. 1.

2              Do you see your Answer?

3         A.   I do.

4         Q.   It says you're a CEO at Francois-Bodine

5    Consulting; is that correct?

6         A.   Yes, founder/CEO/owner.

7         Q.   You didn't tell me that you were CEO

8    before when I asked; is that correct?

9         A.   I believe I shared that I was the owner,

10   so I must have been confused as to your

11   questioning.

12        Q.   Okay.  It says here that Francois-Bodine

13   Consulting is highly exclusive luxury matchmaking

14   and elite relationship consulting agency, do you

15   see that?

16        A.   I do.

17        Q.   That's a term that you used, correct?

18        A.   It's here, yes.

19        Q.   So you hold yourself out as a highly

20   exclusive luxury matchmaking and elite

21   relationship and consulting agency, correct?

22        A.   As per the description previously given,

 1   yes.

 2       Q.   Directing your attention to Answer to

 3   Interrogatory No. 3, at the bottom of the page,

 4   Page 2.  See where it says for Congressman Gary

 5   Peters your title was field organizer, is that

 6   correct?

 7       A.   Correct.

 8       Q.   Did you have any other title?

 9       A.   No.

10       Q.   What was your title for, on the next

11   page, for the Office of the U.S. Senator John

12   Kerry?

13       A.   So it changed twice.  I first went in as

14   a intern then I started working for the

15   legislative office under the Chief of Staff of

16   the office.

17       Q.   Directing your attention to

18   Interrogatory No. 4 on the top of Page 4.  There

19   you attest that you serve as the Chief Executive

20   Officer for Francois-Bodine Consulting, is that

21   correct?

22       A.   That's correct.

1      Q.   Is there a board of directors?

2      A.   There is not.

3      Q.   Is there a chairman of the board?

4      A.   I am.

5      Q.   Is there any other officers?

6      A.   There are not.

7      Q.   There's no secretary?

8      A.   Unsure.

9      Q.   Any president?

10     A.   Unsure.

11     Q.   Does FB Consultants, Inc. still hold its

12  business license to do business in the

13  Commonwealth of Virginia?

14     A.   As of finishing the matchmaking business

15  it's no longer active.  I described that earlier

16  in the conversation a few hours ago.

17     Q.   I was trying to make sure if the license

18  had lapsed or not when you answered this before.

19     A.   Oh, I'm unsure.

20     Q.   Okay.  Directing your attention to

21  Answer to Interrogatory No. 7 on Page 5.  You

22  state, do you see FB Consultant has approximately

1            COURT REPORTER'S CERTIFICATION

2    STATE OF VIRGINIA
     COUNTY OF LOUDOUN
3
              I, Donna Lynch, Court Reporter and
4
     Notary Public, in and for the State of Virginia
5
     do certify that the foregoing deponent's
6
     testimony was duly taken by me stenographically
7
     at the time and place, and for the purpose
8
     therein mentioned and that same was accurately
9
     transcribed to the best of my ability, and I
10
     further certify that I am not interested in the
11
     result of said litigation, either directly or
12
     indirectly.
13
              Given under my hand this____day
14
     of_____, 2020
15
          _____
16        Donna Lynch
          Court Reporter and Notary Public
17

18

19

20

21

22